## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

**EDWIN GARRISON**, *et al.,* on behalf of themselves and all others similarly situated,

       *Plaintiffs,*

v.

**CREATORS AGENCY, LLC,**

       *Defendant.*

                  /

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**CASE NO.:_____**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs file this Complaint on behalf of themselves, and all other similarly situated US and non-US FTX consumers, against Defendant, "Influencer" who promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities.[1]

## INTRODUCTION

1.    This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer order issued by the

---

[1] The Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade, dated December 16, 2022) is incorporated herein by reference and attached hereto as **Exhibit B**. This report was filed last year in the first class action in the country against various FTX Defendants, including Sam Bankman-Fried, other FTX insiders, and Celebrity Brand Ambassadors, which cases were consolidated and are all pending before The Honorable K. Michael Moore. *Garrison, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM (S.D. Fla.).

United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation*, MDL No. 3076, ECF No. 138 (J.P.M.L June 5, 2023), is attached as **Exhibit A**. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance with Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *Garrison v. Paffrath*, Case No. 1:23-cv-21023, is being filed again before this Court in this District in order to address the arguments Defendant Creators Agency, LLC raised regarding whether the Transferee Court has jurisdiction over it for these claims. The substantive allegations in both actions are the same, and will be amended in an administrative consolidated class action complaint currently due to be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.      The FTX disaster is the largest financial fraud in US history. The former FTX CEO, Sam Bankman-Fried ("SBF"), is facing numerous criminal charges and the new CEO—who helped wind down Enron—concluded that this fraud was worse than Enron. Billions of dollars have been stolen from investors across the globe.

3.      FTX was a centralized cryptocurrency platform which specialized in derivatives and leveraged products. It filed for bankruptcy protection in November 2022 and will be involved in federal bankruptcy proceedings for many years. There is no guarantee that any of the victims will be able to see any recovery from those proceedings.

4.      This action may be one of the only avenues for any of the victims to recover any of their damages. Plaintiffs bring this action against a talent management firm and digital ad network that used its YouTube and social media financial influencers and promoters to share financial advice and actively promoted FTX and its yield-bearing-accounts ("YBAs") to their millions of followers. Though FTX paid Defendant handsomely to push its brand and encourage its followers

to invest, Defendant did not disclose the nature and scope of its sponsorships and/or endorsement deals, payments and compensation, nor conduct adequate (if any) due diligence.

5.      With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Evidence has now been uncovered that reveals Influencers played a major role in the FTX disaster and in fact, FTX could not have risen to such great heights without the massive impact of these Influencers, who hyped the Deceptive FTX Platform for undisclosed payments ranging from tens of thousands of dollars to multimillion dollar bribes.[2] Indeed, the most searched companies on the internet today are cryptocurrency brands. According to the NBA 2021–2022 Marketing & Partnerships Annual Report by SponsorUnited, the cryptocurrency industry had a higher search volume during that year than the entire Alcohol & Beverages industry.

6.      It is paramount to understand that the Florida state law claims asserted in this action **do not require "reliance" or "deceit."** The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an "unregistered security," and (b) that was promoted by Defendant for its financial benefit and/or the financial benefit of FTX.

7.      The reality is that anyone around the world with a computer can now be a promoter. Many of these paid FTX Influencers have since asked for forgiveness, because many of these Influencers rely mainly on their alleged independence and impartiality in attracting people to join

---

[2] For example, the company Coinbound touts that: We help crypto brands go viral using Web3's top influencers. An influencer marketing agency built for crypto. https://coinbound.io/influencers/ (accessed August 2, 2023).

their fanbase.[3] This Action is brought to hold liable those Influencers who specifically violated the law under these acts and will serve as precedent to warn and guide Influencers in the future.

8.      State and federal regulators have been required to quickly modify and adjust to all of the changing sources of promoters and marketers. Starting with sponsors on radio, then television and motion pictures and today, to the wild west of the internet, the number of companies that specialize in promoting on social media have sky-rocketed. According to studies, those aged 18 to 34 are more likely to build an interest in an investment specifically from social media, instead of traditional news websites.[4]

9.      Both the Eleventh and Ninth Circuits have already recently entered opinions that specifically social media posts and mass communications (in the cryptocurrency context) made through the internet, exactly like the ones at issue in these claims, are sufficient to state a claim for soliciting the sale of unregistered securities. *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), *cert. denied sub nom. Arcaro v. Parks*, 214 L. Ed. 2d 235 (2022).

10.      Numerous state courts have also interpreted their own state securities laws, such as the Florida Securities and Investor Protection Act ("FSIPA"), to go even further and provide broader protection for investors from aiding and abetting the sale of unregistered securities, such as these YBAs, because the FSIPA, "as its title makes clear, [was designed] to protect the public from fraudulent and deceptive practices in the sale and marketing of securities." *Mehl v. Office of*

---

[3]      https://www.businessinsider.com/influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11 (accessed August 2, 2023).

[4]      https://www.theguardian.com/money/2021/aug/22/as-finfluencers-spread-through-social-media-beware-the-pitfalls (accessed August 2, 2023).

*Financial Regulation*, 859 So.2d 1260, 1264–65 (Fla. 1st DCA 2003) (quoting *Arthur Young & Co. v. Mariner Corp.*, 630 So.2d 1199, 1203 (Fla. 4th DCA 1994).

11.     Literally overnight, Plaintiffs lost their assets held in their YBAs on FTX's trading platform as FTX imploded and filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. In the months following FTX's filing, its founders, including SBF, were charged with numerous counts of fraud and money laundering (among other things) and as of the date of this filing at least three of SBF's cohorts pled guilty to conspiracy and other criminal charges relating to FTX's scheme to defraud its investors.

12.     FTX's fraudulent scheme was designed to take advantage of investors from across the globe, including specifically in Wyoming, who sought out what was represented to be a safe platform to make their investments in the burgeoning cryptocurrency industry. The scheme resulted in FTX investors collectively sustaining billions of dollars in damages.

## PARTIES

13.     **Plaintiffs** are all residents of US and/or a foreign government, and all purchased FTX YBAs.

14.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendant is liable.

15.     **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendant is liable.

16.     **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendant is liable.

17.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendant is liable.

18.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased an

unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Kavuri did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendant is liable.

19.     **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendant is liable.

20.     **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendant is liable.

21.     Defendant **Creators Agency** is a talent management firm and digital ad network which promoted FTX. Upon information and belief, Creators Agency LLC is organized and existing under the laws of the State of Wyoming and has its principal place of business in Tokyo, Japan.

22.     Defendant (1) admittedly endorsed and promoted the sale of the FTX YBAs and (2) did not disclose, in any of his YouTube and other social media posts, that it was paid hundreds of thousands and/or millions of dollars by FTX and profited from the sale of FTX YBAs, in clear violation of SEC, FTC and various federal and state regulations.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than Defendant.

24.     This Court has personal jurisdiction against Defendant because it is registered under the laws of Wyoming.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendant is organized under the laws of this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendant entered into transactions and/or received substantial profits from Class Members who reside in this District.

26.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### I.  Background on Cryptocurrency Litigation Relating to the Promotion of YBAs

27.     Back in 2017, the SEC warned that if YBAs are found to be "securities," persons who promote them may be liable under state and federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

28. The question of whether the sale of FTX YBAs constitutes the sale of "unregistered securities" under the Florida Statutes has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the U.S. Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[5]

> In the SEC's Report of Investigation concerning The DAO,[6] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

29. The SEC and state securities regulators over the past five years have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this exact same type of interest-bearing account, finding that exchanges such as BlockFi,[7] Voyager,[8] and Celsius[9] all offered these same accounts as unregistered securities.

---

[5] https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed August 2, 2023) (emphasis added).

[6] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed August 2, 2023).

[7] https://www.sec.gov/news/press-release/2022-26 (accessed August 2, 2023).

[8] *See, e.g.*, https://www.nj.gov/oag/newsreleases22/Voyager%20Summary%20Order.pdf ( accessed August 2, 2023); https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-order-22-004-s-voyager.pdf (accessed August 2, 2023)

[9] https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf (accessed August 2, 2023).

30.     A second narrow issue that is common to the entire Proposed Class, whose focus is solely objective, is whether this Defendant violated Florida's consumer laws by failing to abide by the FTC's long-established rules and regulations regarding the requirements that must be met in connection with celebrity endorsements, including of items such as cryptocurrency.

31.     In particular, Plaintiffs' claims arise from their purchase of and investment in FTX's YBAs, which, FTX marketed through Defendant, as a type of savings account that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. That is the narrative that Defendant pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, the Defendant is liable for Plaintiffs' losses, jointly and severally and to the same extent as if it were the FTX Entities.

32.     Literally overnight, Plaintiffs' assets held in their YBAs on the FTX Platform were unavailable to them as FTX imploded and filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

> unsophisticated and potentially compromised individuals, this situation is unprecedented.

*See In re: FTX Trading Ltd, et al*., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

33. The losses associated with malfeasance in the cryptocurrency sector are growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors in Wyoming and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff ponzi scheme.

34. The deceptive and failed FTX platform emanated from Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous cryptocurrency conventions. FTX's fraudulent plan was put into effect from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where the Miami Heat—who are 3-time NBA Champions—play.

## II.   Background on FTX

35. Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "<u>FTX Platform</u>")

that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

36.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange, the exchange has dominion and control over those assets.

37.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer. One major factor that affects the exchange's ability to process such requests is whether they have the assets and/or capital necessary to do so. For any non-yield-bearing account, liquidity should not be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, on a 1:1 basis.

38.     FTX's terms of service guaranteed that title to the digital assets in customer accounts remained with the customer and that customers controlled the digital assets in their accounts. FTX violated its own terms of service.

39.     While FTX violated its own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX because FTX exchange accounts are custodial in nature. This means that the customer does not *control* access to the assets "in" their account. Rather, the customer needs to make a request to the exchange to be able to access and send those balances, which then debits the user account and sends the assets. Whether or not such requests are processed is dependent on the willingness, ability, and approval of the exchange.

40.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers' principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

41.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

42.     The main functional differences between banks and cryptocurrency exchanges is that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

43.     Banks are regulated with regards to the type of assets that they can invest customer assets in, subject to regular financial audits, and have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), ensuring that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

44.     In contrast, exchanges like FTX are not subject to the same capital control requirements as banks. While almost all exchanges will indicate that they "securely" store all customer assets 1:1 in "cold storage," there is no regulatory requirement in most jurisdictions (including the U.S.) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or the public.

45.     Other than by an exchange's own terms of service – which FTX violated – exchanges are not prevented from investing customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Nor are

there any requirements for exchanges to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

46.      Due to the risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

47.      Indeed, there is an extensive track record of the cryptocurrency exchanges that have shut down and ultimately failed,[10] often in spectacular fashion. The most common reasons for an exchange's failure include:

a)  The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.
b)  The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.
c)  A hack or theft by an external actor
d)  Embezzlement, or theft by an internal actor, typically founder(s) of the exchange
e)  Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

48.      When exchanges do shut down, it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets

---

[10] https://www.cryptowisser.com/exchange-graveyard/ (accessed August 2, 2023).

back; in many cases, they end up getting nothing back. That is because investors' cryptocurrency belongs to the exchange if they elect to store it "on" the exchange, and if the exchange reneges or is unable to fulfill its liability to the investor, the investor as the beneficial owner of the cryptocurrency has effectively lost its money.

### III.  The Rise and Fall of FTX and Alameda

49.     FTX launched in May 2019 and rapidly became a leading cryptocurrency exchange. FTX was led by SBF as its founder and Chief Executive Officer.

50.     Prior to founding FTX, the Silicon Valley-born, MIT-educated SBF launched his quantitative crypto trading firm, Alameda Research, in November 2017,[11] after stints in the charity world and at trading firm Jane Street.[12] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

51.     By 2018, Bankman-Fried had persuaded Caroline Ellison to join him at Alameda Research. In an interview for Forbes magazine regarding her initial impressions of Alameda, Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'"

52.     In late 2018, Alameda Research relocated its headquarters to Hong Kong. The team at Alameda Research included SBF's close friends (and later co-founders of FTX) Nishad Singh

---

[11]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed August 2, 2023).

[12]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed August 2, 2023).

and Gary Wang. Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and actively traded crypto.

53.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

54.     The FTX.com exchange was extremely successful since its launch. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX team grew to over 300 globally. Although the FTX Entities' primary international headquarters was in the Bahamas, its domestic US base of operations was in Miami, Florida.[13]

55.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

56.     At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities and social medial influencers like Defendant in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[14]

57.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.

58.     Even though they are two separate businesses, the division between FTX and

---

[13]https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed August 2, 2023).

[14]https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed August 2, 2023).

Alameda breaks down in a key place: on Alameda's balance sheet, which was full of the FTT token issued by the FTX exchange that grants holders a discount on trading fees on its marketplace. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX was able to create unlimited amounts of FTT. Thus, in essence, Bankman-Fried's trading giant Alameda rested on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto.

59.     Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Alameda also engaged in margin trading, essentially borrowing money to execute risky trading strategies, which trades in turn were secured by the assets Alameda had borrowed from FTX customers' accounts. That leverage made Alameda's trades (and thus FTX customers' funds) highly vulnerable to adverse market movements. [15]

60.     After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022, Alameda borrowed from FTX some of its customers' assets.[16] Some have suggested that the loans were made for free.[17]

61.     Having borrowed those customer assets, Alameda could then use them as cheap collateral for margined trades with other parties.[18] Indeed, obtaining collateral from other sources

---

[15]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed August 2, 2023).

[16]     https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed August 2, 2023).

[17]https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed August 2, 2023).

[18] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed August 2, 2023).

would have been much more expensive.

62.     In an Alameda balance sheet leaked in early November 2022, FTT tokens were listed as Alameda's largest asset holdings. Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[19] Alameda had few assets that had not been created out of thin air by FTX or FTX-related entities, and when falling crypto prices reduced the value of FTT, Alameda struggled to pay off its lenders.[20]

63.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[21]

64.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[22] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, 2022, that Binance would buy FTX, effectively bailing it out.[23]

---

[19]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed August 2, 2023).

[20]     https://www.nytimes.com/2022/11/30/business/dealbook/ftx-almeda-research-sam-bankman-fried.html#:~:text=Alameda%20served%20as%20the%20token's,to%20facilitate%20its%20trading%20activities. (accessed August 2, 2023)

[21]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed August 2, 2023.

[22]https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed August 2, 2023).

[23]https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed August 2, 2023).

65.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[24] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[25] On November 11, 2022, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[26]

66.     This chain of events was entirely foreseeable to those who were aware of FTX's relationship with Alameda, and their respective dependence on the purported value of FTT. Indeed, as discussed above, their respective reliance on FTT as a mechanism to prop them up and to purportedly offer protection (which was in effect illusory) to FTX customers' whose assets had been lent to Alameda was a risk that was obvious to insiders, but otherwise undisclosed to the market and FTX's customers. The very risk of which Alameda, FTX, and its insiders were aware, accordingly, swiftly came to bear, and FTX's customers were the victims.

67.     Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[27]

---

[24] https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed August 2, 2023).

[25]     https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed August 2, 2023).

[26] https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed August 2, 2023).

[27] https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed August 2, 2023).



**SBF** ✔ @SBF_FTX · Nov 10

1) I'm sorry. That's the biggest thing.

I fucked up, and should have done better.

💬 11K          ⟲ 21.4K          ♡ 59.3K          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly. But of course it's on me that we ended up there in the first place.

💬 218          ⟲ 391          ♡ 4,939          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH. THERE ARE APPROXIMATIONS HERE.]

💬 259          ⟲ 639          ♡ 3,873          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little.

💬 174          ⟲ 636          ♡ 3,592          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

💬 251    🔁 749    ♡ 3,407    ↥



**SBF** ✔ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241    🔁 907    ♡ 3,823    ↥



**SBF** ✔ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116    🔁 278    ♡ 2,882    ↥



**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

○ 155    ⟲ 357    ♡ 3,122    ⬆

**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

○ 162    ⟲ 357    ♡ 3,715    ⬆

**SBF** ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

○ 164    ⟲ 394    ♡ 3,377    ⬆

**SBF** ✓ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

○ 87    ⟲ 234    ♡ 2,625    ⬆



SBF ✔ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102      ⟲ 274      ♡ 3,007      ⬆



SBF ✔ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180      ⟲ 423      ♡ 4,122      ⬆



SBF ✔ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129      ⟲ 235      ♡ 2,502      ⬆



**SBF** ✓
@SBF_FTX                                    •••

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022 · Twitter Web App

**405** Retweets   **201** Quote Tweets   **3,911** Likes

♡   ⟲   ♡   ⬆



**SBF** ✓ @SBF_FTX · Nov 10          •••
Replying to @SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

♡ 214        ⟲ 320        ♡ 2,255        ⬆



**SBF** ✓ @SBF_FTX · Nov 10          •••
17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

♡ 137        ⟲ 198        ♡ 1,878        ⬆



**SBF** ✓ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144          ⟲ 158          ♡ 1,970          ⬆

**SBF** ✓ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ⟲ 760          ♡ 2,776          ⬆

**SBF** ✓ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses. So for now, all I'll say is:

well played; you won.

💬 1,532          ⟲ 3,303          ♡ 8,047          ⬆

**SBF** ✓ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908          ⟲ 1,055          ♡ 3,463          ⬆



68.   According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[28]

## IV.   FTX Insiders Plead Guilty to Numerous Criminal Charges Relating to FTX's Fraudulent Scheme

69.   On January 3, 2023, SBF pled not guilty to eight criminal charges during a court hearing at the U.S. District Court for the Southern District in *USA v. Bankman-Fried*, 1:22-cr-00673-LAK-1. On February 23, 2023, a Superseding Indictment was unsealed, which added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.*, Doc. 80. SBF faces over 100 years in prison in connection with charges predicated on his lying to investors and stealing billions of dollars in customers' money. His trial is set to commence in October 2023.

70.   In December 2022, Ellison and Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit

---

[28]   https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed August 2, 2023).

commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money

laundering. In entering her guilty plea, Ellison told a federal judge in Manhattan:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.
>
> I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to

Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[29]

71.     In entering his guilty plea, Wang similarly told the federal judge in Manhattan:

Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

72.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried, apologized for his role in FTX's scheme, and admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[30]

## V.  The SEC's Consistent Approach to Cryptocurrency

### A.  Overview

---

[29]     https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (last accessed August 2, 2023)

[30]     https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed August 2, 2023).

73.     The SEC's stance on cryptocurrency has been clear and consistent from the beginning. The Securities and Exchange Acts are intentionally drafted to apply to a broad range of securities. As such, the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

74.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)[31]

75.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court

---

[31] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed August 2, 2023).

Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

76.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[32] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test provides that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[33] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

77.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[34]

---

[32] https://supreme.justia.com/cases/federal/us/328/293/ (accessed August 2, 2023).

[33] *Id.*

[34] ia_virtualcurrencies.pdf (sec.gov) (accessed August 2, 2023).

78.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[35] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[36] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[37]

79.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[38]

---

[35] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed August 2, 2023).

[36] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed August 2, 2023).

[37] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed August 2, 2023).

[38] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed August 2, 2023).

80.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[39] multiple speeches,[40] Congressional testimony,[41] and several official SEC statements[42] and proclamations.[43] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[44] warning that their failure to register with the SEC may violate U.S. securities laws.[45] In one interview, Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[46]

81.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[47] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities,"

---

[39] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed August 2, 2023).

[40] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed August 2, 2023).

[41] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed August 2, 2023).

[42] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11(accessed August 2, 2023).

[43]https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed August 2, 2023).

[44] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed August 2, 2023).

[45]https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed August 2, 2023).

[46] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed August 2, 2023).

[47] SEC.gov | Kennedy and Crypto (accessed August 2, 2023).

a position that was also held by his predecessor, Jay Clayton.[48] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[49]

82.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[50]

83.     What follows are summaries of five cases that will help inform this litigation.

**B.  SEC v. KIK**

84.     In Kik[51], the SEC's complaint[52], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[53]

85.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from

---

[48] *Id.*

[49] *Id.*

[50] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed August 2, 2023).

[51] https://www.sec.gov/news/press-release/2020-262 (accessed August 2, 2023).

[52] https://www.sec.gov/news/press-release/2019-87 (accessed August 2, 2023).

[53] https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed August 2, 2023).

registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

### C.  SEC v. Telegram

86.     In Telegram,[54] the SEC filed a complaint[55] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

87.     Telegram argued[56] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

88.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[57] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

89.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration

---

[54] https://www.sec.gov/news/press-release/2020-146 (accessed August 2, 2023).

[55] https://www.sec.gov/news/press-release/2019-212 (accessed August 2, 2023).

[56] https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed August 2, 2023).

[57] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed August 2, 2023).

provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### D.  SEC v. BlockFi

90.     In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [58] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

91.     BlockFi argued for "increased regulatory clarity" but lost.[59]

92.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### E.  SEC Wells Notice to Coinbase

93.     In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets

---

[58] https://lnkd.in/d-Xy45ec (accessed August 2, 2023).

[59] https://blockfi.com/pioneering-regulatory-clarity (accessed August 2, 2023).

on Coinbase, starting with 4% APY on USD Coin (USDC)."[60] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

94.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[61]

95.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Family Resemblance Test").

96.     Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

97.     Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper-type notes such as purchase money loans and privately negotiated bank loans. To reconcile these

---

[60] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed August 2, 2023).

[61] *Id.*

varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

98.     Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and 7) a note evidencing loans by commercial banks for current operations.

99.     The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

100.     Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

101.    Given the clear facts of the case, Coinbase decided to cancel the Lend program.[62]

**VI.    FTX's offer and sale of YBAs, which are unregistered securities.**

102.    Beginning in 2019, the FTX Entities began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

103.    The details of the Earn program were listed on the FTX website.[63] Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets.[64]

104.    On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[65]

105.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

106.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[66] Staking serves a similar function to

---

[62] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed August 2, 2023).

[63] FTX App Earn – FTX Exchange (accessed August 2, 2023).

[64] FTX App Earn – FTX Exchange (accessed August 2, 2023).

[65] *Id.*

[66] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[67]

107.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[68] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[69]

---

[67] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed August 2, 2023).

[68] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed August 2, 2023).

[69] *Id.*

108.     Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY.

109.     From a securities perspective, the *Howey* Test defines an investment contract if it is (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

110.     <u>Plaintiffs here invested money</u>. Plaintiffs' investment of assets, even if such investments were in the form of cryptocurrencies, satisfy the "investment of money" prong for an investment contract.

111.     <u>Plaintiffs here invested in a common enterprise.</u> FTX promoted and paid for advertisements which touted earning up to 8% "yield" on any fiat or crypto held in a YBA, along with representations that customers are eligible to earn the "yield," on an hourly basis, simply by passively keeping the funds in the YBA. FTX also made the same YBAs available to all FTX customers, and all assets held in the account, whether crypto or fiat, earned the same rate of interest. Once investors logged into their YBAs, the earn capability was automatically enabled, and they passively earned yield. FTX has admitted that these earn "[s]ervices are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user." FTX's Terms of Service further make clear that investor funds are pooled together and used for lending and investment activities that would generate the yield, i.e., "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." The blockchains data contains an immutable and

verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

112.   <u>Plaintiffs here invested with the expectation of profit from the efforts of others</u>. FTX customers clearly had an expectation of profit, as they were guaranteed to earn up to 8% "yield" for any fiat or crypto held in a YBA. FTX represented that customers are eligible to earn the "yield," which is rewarded hourly simply by passively keeping the funds in the YBA. Moreover, Plaintiffs expected that they would earn these yield profits primarily, if not solely, from FTX's efforts in managing the assets invested into the YBAs, and not through their own efforts. Indeed, the assets were not actually "in" Plaintiffs' YBAs at all and were instead pooled with all other FTX customer assets, as explained in the FTX's Terms of Service, i.e., "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." The yield was generated entirely through FTX's efforts from either staking assets from the pooled account or otherwise lending assets, most notably to Alameda., FTX freely admits that the yield was earned entirely through FTX's efforts, as they admit that the Earn "Services are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user.[70]

113.   In addition, the FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user. The work that 'others' (namely FTX) would need to do would include, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and

---

[70]   https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed August 2, 2023).

investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The primary strategy that FTX portrayed to investors was "staking," as discussed herein.

114.    The FTX Earn program was a note under *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[71] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[72]

115.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id*., at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-

---

[71] FTX App Earn – FTX Exchange (accessed August 2, 2023).

[72] https://www.sec.gov/news/press-release/2022-26 (accessed August 2, 2023).

bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[73] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

---

[73] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application was developed by Blockfolio.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario,

your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil. FTX serves all Japanese residents via FTX Japan.
> (emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as

generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## VII.   FTT Token

116.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee

discounts, rebates and early access to token sales held on the platform."[74] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[75]

117.    FTT meets the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is met. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[76] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[77]

---

[74] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed August 2, 2023).

[75] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed August 2, 2023).

[76]    https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed August 2, 2023).

[77] https://www.sec.gov/news/press-release/2020-338 (accessed August 2, 2023).

## VIII.    The FTX Platform

118.    Another avenue through which FTX users were exposed to a securities transaction was through the basic structure of the platform. Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks. When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account. Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

119.    FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments.

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the

absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[78]

120.   In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[79] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[80] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[81]

121.   To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX

---

[78] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed August 2, 2023).

[79] *Id.*

[80] *Id.*

[81] *Id.*

was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[82] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[83] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[84]

122.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[85] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[86] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from

---

[82]    https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed August 2, 2023).

[83] FTX customers deposited more than $5 billion in those Alameda accounts.

[84] *Id.*

[85] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed August 2, 2023).

[86] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed August 2, 2023).

other sources would have been much more expensive).[87] It appears that Alameda did post collateral to secure the loans of customer crypto assets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

123.     In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[88] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

124.     After the CoinDesk report came out on November 2, 2022, the CEO of FTX's rival exchange Binance, Changpeng Zhao, tweeted that Binance was planning to sell off its holdings of

---

[87] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed August 2, 2023).

[88]https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed August 2, 2023).

FTT. This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

125.    While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

126.    First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

127.    Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their crypto assets out of the exchange at the same time. Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. Given these facts, it appears that any person who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

128.     Thus, as will be illustrated below, the FTX Brand Ambassadors' promotion of "FTX" was necessarily the promotion of unregistered securities.

## IX.   Defendant Aggressively Marketed the FTX Platform

129.     From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with crime, frauds and scams."[89] Everyday consumers have also fallen victim to various cryptocurrency-related scams.[90]

130.     There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest.

131.     All the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[91] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

132.     Crypto firms like FTX turned to celebrity and social media endorsers to position itself as the "safe" option among cryptocurrency exchanges. The FTX advertising campaign is

---

[89] https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed August 2, 2023). Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed August 2, 2023)' Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed August 2, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed August 2, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed August 2, 2023).

[90] See Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed August 2, 2023); Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed August 2, 2023).

[91] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center (last accessed August 2, 2023).

particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency, which were proven untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

133.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific YouTube and other social network influencers to convince consumers that FTX was a safe place to buy and sell cryptocurrency. As Mr. Sibenik explains, FTX's brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' Ex. B  44–49.

134.    FTX not only deployed such well-known celebrities such as Stephen Curry, Kevin O'Leary as brand ambassadors, *id.*, but it also engaged in aggressive global digital marketing, particularly through influencer "crypto marketing" on YouTube and other social networks.

135.    "Crypto marketing" is the execution of marketing and advertising efforts with the goal of raising awareness, acquiring users, or driving growth for a cryptocurrency or blockchain-related product. Popular crypto marketing strategies include influencer marketing, community growth, social media management, and grassroots digital marketing, and tout great results and valuable case studies, specifically with promoting cryptocurrency.[92]

136.    Social media "influencers" are individuals who have amassed a large following on platforms such as Instagram, YouTube, and TikTok, and use their influence to promote products, services, and ideas. Social media influencers are characterized by a huge number of highly loyal and engaged social media followers, who share a rapport with their fans and are perceived as everyday people who are experts in their niches.

137.    Unlike mainstream celebrities, influencers don't shroud their lives in an air of mystery and present themselves as real-life consumers who share authentic and valuable

---

[92] Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound (last accessed August 2, 2023).

information with their followers.[93] They create content that resonates with their followers, often by sharing their personal experiences, lifestyle choices, and preferences. By doing so, they establish a sense of authenticity and relatability with their audience, which can be incredibly compelling.

138.    Influencer marketing thus involves collaborating with a social media influencer to increase brand visibility and strengthen a brand's reputation. When executed correctly, it helps win more customers from target audiences and earn more revenue. What differentiates influencer marketing from other types of celebrity marketing is that it is perceived as more authentic and trustworthy, because, owing to an influencer's rapport with their fans, their recommendations aren't dismissed as fake and sponsored endorsements. *Id.* Instead, their followers often swear by the recommendations made by their favorite influencer. *Id.* Because their audience trusts them, they are more likely to take their recommendations, which can lead to increased sales for the products they promote.

139.    While influencer digital marketing is more expensive than other types of paid media, studies done on the subject show that the majority of marketing teams have found the return of investment ("ROI") on influencer marketing to be higher than that of other forms of online growth tactics.[94] According to a recent study, influencer marketing delivers an ROI of $6.5 for every $1 spent. This is far higher than the ROI of other forms of digital marketing.[95] Digital content creators also can more precisely target their marketing efforts by using highly sophisticated

---

[93] The Rise of Influencer Marketing: All You Need to Know | Shane Barker (last accessed August 2, 2023).

[94] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed August 2, 2023).

[95] *Id*; The Rise of Influencer Marketing: All You Need to Know | Shane Barker (last accessed August 2, 2023).

analytic tools such as Google Analytics to measure their site's traffic, where its coming from, and who is visiting their sites.[96]

140.    As such, digital marketing through social media is extremely effective at influencing consumer decisions. According to a survey from the National Association of Professional Financial Advisors (NAPFA), more than one-quarter of Gen Zers learn about finance from social media. The survey results also show that more than one-third (39%) of Americans under 65 receive their financial advice from social media.[97] When it comes to where they are getting financial advice, YouTube is one the most popular platforms for Gen Z (63%) and Millenials (71%) to discuss financial planning and investment in cryptocurrency.[98] More than 60% of the respondents who received their information online say they have acted on that advice.[99]

141.    YouTube, which allows for long-form video content which can exist in perpetuity, is one of the most effective social media channels for targeting cryptocurrency audiences and has found its way into the daily routine of millions of cryptocurrency enthusiasts worldwide.[100]

---

[96] Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound (last accessed August 2, 2023).

[97] https://www.napfa.org/social-media-survey (last accessed August 2, 2023).

;                                                                    http://s3.napfa.cql-aws.com.s3.amazonaws.com/files/Consumer/NAPFA%20Fall%202021%20Full%20Report.pdf

[98] https://www.thebalancemoney.com/8-personal-finance-influencers-you-should-know-6544780 (last accessed August 2, 2023).

; https://www.napfa.org/social-media-survey (last accessed August 2, 2023).

[99] *Id.*

[100] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed August 2, 2023).

142.    Many of the most famous finance and money social media influencers collaborated with FTX, working under the umbrella of Defendant, Creators Agency, a talent management firm for digital creators. Defendant touts its expansive reach, claiming to have reached "millions," including 2.94B+ YouTube views and 27M+ YouTube Subscribers. Though not all Defendant's clients endorsed FTX, many of the talent it manages netted hundreds of thousands, if not millions of dollars from signed contracts procured and/or facilitated by the agency.

143.    For their part, Kevin Paffrath, Graham Stephan, and Tom Nash, who prior to FTX's collapse promoted FTX as a safe investment to their legions of followers, have now scrubbed their YouTube channels of all video clips endorsing FTX and praising Sam Bankman-Fried. In their place, the YouTube Influencers have substituted *mea culpas* and apology videos acknowledging their significant role in promoting FTX and causing billions of dollars of investor losses.[101]

144.    For example, Kevin Paffrath, who upon information and belief received $2,500 every time he mentioned FTX in one of his videos, posted a video to his "Meet Kevin" YouTube channel (with over 1.86 million subscribers) on November 22, 2022 in which he states: "Yes, I used to be sponsored by FTX. I think that is a disgrace. And it's a scar. And it sucks. If I could go

---

[101]   https://markets.businessinsider.com/news/stocks/personal-finance-influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11               (last         accessed         August         2,         2023); https://www.marketwatch.com/story/my-bad-the-youtube-financial-influencer-network-paid-to-pump-ftx-11669066275 (last accessed August 2, 2023); https://www.yahoo.com/now/social-media-influencers-fed-bankman-150327348.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAAFrNFPdXzgk_rsYJLmGipe0izPCSeyp9dftZXdh3UKccPhgIT5hGLIBUr4EomSeyDd8qFMKHI2U6E-SjCbOo3Z95op0l0nkbEJQI8zAioDqWsrUB20ugMHs7VihR81OwoUOwlbB9vCuN1IhofQkBjiMacwXy6b3F7ASrvOGN3pgb (last accessed August 2, 2023);

back I would change it, because people got hurt because of that. I feel so terribly about that. People got hurt because of FTX and it's a disgrace."[102]

145.   Similarly, Graham Stephan had built a loyal fanbase on YouTube by sharing financial advice. After aggressively promoting FTX, he posted a video titled "My response to FTX" to his YouTube channel (with over 4.22 million subscribers) on November 28, 2022 in which he states: "FTX US has been a recurring sponsor here on the channel since spring of this year. . . . I can't even begin to share how devastated and sorry I am. . . . I made the mistake of working with a platform who operates within an industry that does not already have proper consumer protections in place. . . [O]n the most basic level, I made the mistake of assuming that Sam Bankman-Fried's image had anything to do with his credibility. . . . I fell into his trap of effective altruism."[103]

146.   Tom Nash, who apparently posted a video following FTX's bankruptcy in which he claimed to only have worked with FTX US, which he falsely represented in the video to be "100% operational, nothing is going on with FTX US," has since taken down that video, along with several other videos in which he gave full-throated endorsements of FTX.

147.   Endorsements by social media influencers are even more dangerous, because of their broad public reach. People are more likely to watch YouTube than network television. Micro-celebrities and social media influencers thus can have outsized influence on their audience, particularly those that espouse financial advice. FTX capitalized on this dynamic, and sponsored several of those content creators, particularly on YouTube.

---

[102] https://www.youtube.com/watch?v=qpDeks14TMk (accessed August 2, 2023)

[103] https://www.youtube.com/watch?v=jcy9PyMvNqc (accessed August 2, 2023)

148.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[104] In addition, CME Group CEO Terry Duffy allegedly told SBF that he was "an absolute fraud" upon having an initial conversation with him.[105] Finally, after FTX's implosion, the Financial Times reported that FTX held talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[106] While the article does not detail the reasons why Swift declined the FTX offer, it does include the following quote from a person close to the negotiations:

> Taylor would not, and did not, agree to an endorsement deal. The discussion was around a potential tour sponsorship that did not happen.[107]

149.    Based upon the information that has been released by FTX's new CEO, John Ray as part of the company's bankruptcy filings, anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

---

[104] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed August 2, 2023).

[105]     https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed August 2, 2023).

[106] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed August 2, 2023).

[107] Id.

unsophisticated and potentially compromised individuals, this situation is unprecedented.[108]

150.    Mr. Ray's pleading contains a number of troubling findings, among them: 1) FTX did not have centralized control of its cash, 2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Entities, 3) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4) Corporate funds were used to purchase homes and personal items for employees, and 5) A lack of books and records and the absence of lasting records of decision-making.

151.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

152.    Instead, tens of thousands of customers relied on the testimonials of paid endorsers, facilitated by Defendant, who knew why they were being compensated. Indeed, the whole point behind paying influencers to endorse a product is to increase sales. Thus, influencers have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

153.    In addition to the conduct of SBF, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX and/or been paid to serve

---

[108]https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed August 2, 2023).

as brand ambassadors for the company. Several of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

154.    In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

155.    FTX's explanation for using social media influencers – micro-celebrities in their own right – and stars like Tom Brady and supermodel Gisele Bunchden was no secret: "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[109]

156.    In other words, the FTX Entities needed influencers like those working with Defendant to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities.

---

[109]    https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed August 2, 2023).

## **CLASS ACTION ALLEGATIONS**

157.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### I.  Class Definitions

158.     Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, the "Classes"):

(1) **Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

(2) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

**(3)** __Florida Subclass:__ All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes is Defendant, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

159.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendant substantially participated) were made by FTX from its principal place of business in Miami, Florida, through its interactive website and mobile app which were accessible to Florida residents and were actually used to effect commercial transactions with customers in Florida, thus the sales of FTX YBAs stem from a transactional occurrence that emanated from the State of Florida.

**II.  Numerosity**

160.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

### III.  Commonality/Predominance

161.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

> (a)  whether the YBAs were unregistered securities under federal or Florida law;
>
> (b)  whether Defendant's participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.
>
> (c)  the type and measure of damages suffered by Plaintiffs and the Class.
>
> (a)  whether Defendant's practices violate the FDUTPA;
>
> (b)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;
>
> (c)  whether Plaintiffs and Class members are entitled to injunctive relief;
>
> (d)  whether Plaintiffs and Class members are entitled to declaratory relief; and
>
> (e)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

### IV.  Typicality

162.     Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs because of Defendant's actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

## V.   Adequacy of Representation

163.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI.   Requirements of Fed. R. Civ. P. 23(b)(3)

164.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendant (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform.

165.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

166.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**A.  Superiority**

167.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**VII.   Requirements of Fed. R. Civ. P. 23(b)(2)**

168.    Defendant has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

169.    Defendant has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for its promotion

of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**VIII.   Requirements of Fed. R. Civ. P. 23(c)(4)**

170.   As it is clear that one of the predominant issues regarding Defendant's liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

171.   As it is clear that another predominant issue regarding Defendant's liability is whether it has violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for its promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**IX.   Nature of Notice to the Proposed Class.**

172.   The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**COUNT ONE**
**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Classes)**

173.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–172 above, as if fully set forth herein.

174.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt

under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

175.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

176.    The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

177.    The YBAs sold and offered for sale to Plaintiff and Class members were not:

    a.   exempt from registration under Fla. Stat. § 517.051;

    b.   a federal covered security;

    c.   registered with the Office of Financial Regulations (OFR); or

    d.   sold in a transaction exempt under Fla. Stat. § 517.061.

178.    The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

179.    Defendant is an agent of the FTX Entities pursuant to Fla. Stat. § 517.211.

180.    The FTX Entities, with Defendant's material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendant violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

**COUNT TWO**
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(Plaintiffs Individually and on behalf of the Classes)**

181.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–172 above, as if fully set forth herein.

182.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

183.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

184.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

185.     Defendant's unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead – and have materially misled – consumers acting reasonably in the circumstances.

186.     Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

187.     Plaintiffs and consumers in the Classes have been aggrieved by  Defendant's unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the FTX Platform and in the amount of their lost investments.

188.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

189.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

190.    Defendant still utilizes many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendant's unfair and deceptive scheme.

**COUNT THREE**
**Civil Conspiracy**
**(Plaintiffs Individually and on behalf of the Classes)**

191.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–172 above, as if fully set forth herein.

192.    The FTX Entities and Defendant made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and were not being invested in unregistered securities.

193.    The FTX Entities entered into one or more agreements with Defendant with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the FTX Platform.

194.    Defendant engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

195.    Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendant had knowledge of such fraud and/or wrongdoing, because of its experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

196.    Defendant's conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

**COUNT FOUR**
**Declaratory Judgment**
**(Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq*.)**
**(Plaintiffs Individually and on behalf of the Classes)**

197.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–172 as if fully set forth herein.

198.    This Count is asserted against Defendant under Florida Statutes §§ 86.011, *et seq*.

199.    There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

200.    Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

201.    Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on Defendant's misrepresentations and omissions regarding the FTX Platform as further described hereinabove.

202.    If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the FTX Platform does not work as represented, and Defendant was paid exorbitant sums of money to peddle FTX to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

203.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether Defendant illegally solicited their purchase from Plaintiff and the Class.

204.    Plaintiffs and the Class seek an order declaring that the YBAs were securities that the FTX Platform did not work as represented, and Defendant was paid exorbitant sums of money to peddle FTX to the nation.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Class as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues if warranted;

d.    Awarding declaratory relief as permitted by law or equity, including declaring Defendant's practices as set forth herein to be unlawful;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing those unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them all money it is required to pay;

f.      Awarding statutory and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: August 3, 2023                    Respectfully submitted,

**By:** */s/*_____

Alex Freeburg | WY Bar No. 7-5182
**FREEBURG LAW LLC**
PO Box 3442
Jackson, WY 83001
Telephone: (307) 200-9720
alex@tetonattorney.com

Adam M. Moskowitz
(*Pro Hac Vice* to be filed)
Joseph M. Kaye
(*Pro Hac Vice* to be filed)
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
rejane@moskowitz-law.com

David Boies
(*Pro Hac Vice* to be filed)
Alex Boies
(*Pro Hac Vice* to be filed)
Brooke Alexander
(*Pro Hac Vice* to be filed)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

*Counsel for Plaintiffs and the Class*